CASE NO. 22-3179

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

STATE OF NEBRASKA, et al.,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, JR., in his official capacity as the President of the
United States of America, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Missouri
The Honorable District Court Judge Henry E. Autrey
Case No. 4:22-cv-1040-HEA

## EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

ERIC S. SCHMITT
  *Attorney General of Missouri*
D. JOHN SAUER
  *Solicitor General of Missouri*
MICHAEL E. TALENT
  *Deputy Solicitor General of Missouri*
MISSOURI ATTORNEY GENERAL'S
  OFFICE
Post Office Box 899
Jefferson City, MO 65102
(314) 340-4869
michael.talent@ago.mo.gov

DOUGLAS J. PETERSON
  *Attorney General of Nebraska*
JAMES A. CAMPBELL
  *Solicitor General of Nebraska*
CHRISTIAN EDMONDS
  *Assistant Solicitor General of
  Nebraska*
OFFICE OF THE NEBRASKA
  ATTORNEY GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

STATEMENT ............................................................................................... 2

I.   Background on Student Loans ........................................................ 2

II.  Mass Debt Cancellation ................................................................ 4

III. Procedural History ........................................................................ 6

ARGUMENT ............................................................................................... 7

I.   The States have a strong likelihood of success on appeal. .............. 8

    A.   The States have standing. ....................................................... 8

        1.   Missouri has standing to vindicate the harms to MOHELA as a servicer of Direct Loans. ...................... 8

        2.   The direct tax losses create standing. ......................... 11

        3.   The consolidation harms create standing. .................. 13

        4.   The States' sovereign and quasi-sovereign interests create standing. ........................................... 15

    B.   The States are likely to prevail on their APA claim that the Department is exceeding its authority. .......................... 16

        1.   The major-questions doctrine applies. ........................ 17

        2.   No clear congressional authorization exists. ............... 19

    C.   The States are likely to prevail on their APA arbitrary-and-capricious claim. ........................................................... 22

    D.   The States are likely to prevail on their ultra-vires separation-of-powers claim. ................................................... 24

II.  The States face irreparable harm without an injunction. ............. 25

Appellate Case: 22-3179   Page: 2   Date Filed: 10/21/2022 Entry ID: 5210216

III.  An injunction would not injure the Department, and the public interest favors an injunction. .............................................26

CONCLUSION .....................................................................................27

CERTIFICATE OF COMPLIANCE.........................................................30

CERTIFICATE OF SERVICE...................................................................31

ii

# INTRODUCTION

The Supreme Court just warned federal agencies against "asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Yet the Biden Administration is doing exactly that through its Mass Debt Cancellation, which will erase over $400 billion of the $1.6 trillion in outstanding federal student loan debt.

The statute on which the Administration relies—the Higher Education Relief Opportunities for Students Act (HEROES Act)—does not empower the Department of Education or its Secretary to decree the Cancellation. This agency action thus exceeds the Administration's authority, violates the separation of powers, and is hopelessly arbitrary.

This Court should enter an injunction pending appeal because the States have standing, are facing irreparable harm, and are likely to succeed on the merits of their claims. In contrast, no borrower will be disadvantaged by interim relief because loan repayments and interest accruals are paused, and the Department can continue that forbearance while this appeal is pending.

1

## STATEMENT

## I.   Background on Student Loans

The Higher Education Act (HEA) establishes the Direct Loan Program and Federal Family Education Loan (FFEL) Program. 20 U.S.C. §§1071 *et seq.* (FFEL), 1087a *et seq.* (Direct). Direct Loans are held by the Department and serviced by entities that contract with the Department. *See* R. Doc. 5-1, at 194–254. The Higher Education Loan Authority of the State of Missouri (MOHELA)—a "public instrumentality" of the State of Missouri, Mo. Rev. Stat. §173.360—is one of those servicers and customer-support providers. *See* R. Doc. 5-1, at 194–396. MOHELA services accounts for borrowers in all 50 States. *See id.* at 92–93.

FFEL loans are held by either the Department or non-federal organizations. *See* R. Doc. 31-1, at 7–10. Borrowers may consolidate FFEL loans into Department-held Direct Loans, thereby eliminating the original FFEL loans. *See id.* at 19–20.

Financial entities that hold FFEL loans use them as assets to secure bonds, and they earn income from the payments on those loans. *See* R. Doc. 5-1, at 60, 66; R. Doc. 5-4, at 2, ¶6. MOHELA not only holds

2

FFEL loans but also services those loans, which provides it with "ongoing revenue streams" from the interest payments and servicing fees. R. Doc. 5-1, at 66–67. Like MOHELA, the Arkansas Student Loan Authority (ASLA)—part of the Arkansas Development Finance Authority—holds FFEL loans. R. Doc. 5-4, at 2, ¶6.

Many institutions also invest in student-loan asset-backed securities (SLABS) secured by FFEL loans. *See* R. Doc. 5-2, at 1–2, ¶¶4–5. The Nebraska Investment Council (NIC)—which invests assets of the State of Nebraska, including the pension fund, *see* Neb. Rev. Stat. §72-1239.01—has tens of millions of dollars in SLABS. *See* R. Doc. 5-2, at 1–2, ¶¶4–7.

Soon after the COVID-19 pandemic began, then-President Trump, Congress, and the Department paused payments and interest accrual on Department-held student loans. *See* 85 Fed. Reg. 79856, 79862–63 (Dec. 11, 2020). The Department has repeatedly extended that forbearance, and it is in place until December 31, 2022. *See* 87 Fed. Reg. 61512, 61514 (Oct. 12, 2022). Last month, the President declared "[t]he pandemic … over." 60 Minutes, Twitter (Sept. 18, 2022), https://tinyurl.com/2s35maau.

Appellate Case: 22-3179     Page: 6     Date Filed: 10/21/2022 Entry ID: 5210216

## II. Mass Debt Cancellation

Meanwhile, on August 24, 2022, the Administration announced its Mass Debt Cancellation. R. Doc. 5-3, at 4. An Administration official explained that President Biden had "promised to provide targeted student debt relief" "[d]uring the [2020 presidential] campaign" and was now "following through on that." *Id.* at 29. In an accompanying memorandum, the Department revoked its prior view that cannot cancel student debt en masse, *see* Memorandum from Rubinstein to DeVos 6 (Jan. 12, 2021), https://tinyurl.com/3kp29ys6 [Jan. 2021 Memo], claiming for the first time that it has such power, *see* 87 Fed. Reg. 52943 (Aug. 30, 2022).

The Congressional Budget Office estimates that this Cancellation will eliminate $430 billion of the $1.6 trillion in federal student debt. CBO Sept. 26, 2022 Letter at 3, https://tinyurl.com/2p95x8kk. Other analyses project that the costs will reach up to $519 billion. R. Doc. 5-3, at 23. Of the 43 million borrowers who still owe, *see* CBO Sept. 26, 2022 Letter at 3, over 40 million will be eligible for the Cancellation, and nearly 20 million "will have their debt completely canceled." R. Doc. 5-3, at 31; R. Doc. 31-1, at 24.

Appellate Case: 22-3179     Page: 7     Date Filed: 10/21/2022 Entry ID: 5210216

To be eligible, borrowers must owe on Direct Loans, FFEL loans, or Perkins loans held by the Department. 87 Fed. Reg. at 61514. Borrowers also must have had "an Adjusted Gross Income (AGI) below $125,000 for an individual taxpayer or below $250,000 for borrowers filing jointly … in *either* the 2020 or 2021 Federal tax year." *Id.* (emphasis added). The Department will cancel up to $20,000 for eligible borrowers who received a Pell grant and $10,000 for those who did not. *Id.*

Originally, the Department told "borrowers with privately held federal student loans," including FFEL loans, that they can receive the Cancellation "by consolidating these loans into the Direct Loan program." R. Doc. 5-3, at 9. This incentivized borrowers to consolidate their non-federally held FFEL loans into Direct Loans. *See* Carmen Arroyo, *Biden's Student-Loan Relief Plan Stirs a $100 Billion Plus Debt Market*, Bloomberg (Sept. 2, 2022), https://tinyurl.com/43sc7ec4.

On October 7, the Department first produced its August 24 Rationale Memo attempting to justify the Cancellation. R. Doc. 27-1, at 10–22. That Memo did not consider any alternative to the widespread elimination of debt. Nor did it address why the Cancellation includes households earning up to $250,000 or why it is enough if a borrower falls under the

Appellate Case: 22-3179     Page: 8     Date Filed: 10/21/2022 Entry ID: 5210216

income cutoff in 2020 *or* 2021 (rather than in both years). The Secretary did not carefully consider the Memo but rather signed off on it at 9:25 am the morning he received it. *Id.* at 25.

On October 12, the Secretary published the Cancellation's terms in the Federal Register. 87 Fed. Reg. 61512.

## III. Procedural History

The States filed this suit on September 29. R. Doc. 1. That same day, the Department announced that borrowers with non-federally held FFEL loans can no longer become eligible "by consolidating those loans into Direct Loans," but that borrowers "who have applied to consolidate … prior to Sept. 29[] are eligible." R. Doc. 31-1, at 9. The Department made this change to try to avoid lawsuits like this one because entities holding and investing in FFEL loans were "widely seen, both inside and outside the administration, as presenting the greatest legal risk" to the Cancellation. Michael Stratford, *Biden Administration Scales Back Student Debt Relief for Millions Amid Legal Concerns*, Politico (Sept. 29, 2022), https://tinyurl.com/2hexr9cf.

Also on September 29, the States moved for a preliminary injunction. R. Doc. 3. In response, the Department told the district court that

6

it might start discharging debt as soon as October 23. R. Doc. 27-1, at 4, ¶5. On October 20, the district court denied the States' motion for a preliminary injunction and dismissed their case for lack of standing. R. Doc. 44 & 46. Later that day, the States filed a notice of appeal, R. Doc. 47, and asked the district court for an injunction or administrative stay pending appeal, R. Doc. 48. Thereafter, the States filed this emergency motion without waiting for the district court's ruling because further delay was "impracticable" since the Department might start discharging debt in just two days. Fed. R. App. P. 8(a)(2)(A)(i).

## ARGUMENT

"To be entitled to an injunction pending appeal, appellants … must show (1) the likelihood of success on the merits; (2) the likelihood of irreparable injury to appellants absent an injunction; (3) the absence of any substantial harm to other interested parties if an injunction is granted; and (4) the absence of any harm to the public interest if an injunction is granted." *Shrink Missouri Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998). Those factors support an injunction here.

7

I.      **The States have a strong likelihood of success on appeal.**

A.      **The States have standing.**

"[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006).  To establish standing, plaintiffs must show injury, causation, and redressability. *Kuehl v. Sellner*, 887 F.3d 845, 850 (8th Cir. 2018).  States are "entitled to special solicitude in [the] standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).  The States here have established standing in four ways.

1.      **Missouri has standing to vindicate the harms to MOHELA as a servicer of Direct Loans.**

Missouri is harmed from the financial losses that the Cancellation inflicts on MOHELA as a servicer of Direct Loans.  MOHELA is "a public instrumentality" of the State of Missouri.  Mo. Rev. Stat. §173.360.  Its board is comprised of public officials and individuals appointed by the governor with the consent of the Missouri Senate. *Id.*  It is part of the Missouri Department of Higher Education and Workforce Development. §173.445.

State law charges MOHELA with the "essential public function[s]" of ensuring "all eligible postsecondary education students have access to

8

student loans" and providing financial support to Missouri's public colleges and universities. §173.360. To further these goals, MOHELA originated over $4 million in loans for Missouri students during the last fiscal year and gave $6 million to the State's Department of Higher Education for various financial assistance programs benefiting Missouri students and schools: Access Missouri Financial Assistance Program; Bright Flight Scholarship fund; and A+ Scholarship Program. MOHELA FY 2022 Financial Statement at 9–10, 19, https://tinyurl.com/4chp295x.

MOHELA funds those essential public functions through its work as a servicer of and customer-support provider for Direct Loans. *See* R. Doc. 5-1, at 194–396 (MOHELA's contracts). Last fiscal year, MOHELA earned $88.9 million for "servicing 5.2 million" Direct Loan accounts and $5.1 million for customer support. MOHELA FY 2022 Financial Statement at 4. This revenue is determined by how many accounts MOHELA services—the more it services, the more it earns, *see* R. Doc. 5-1, at 197–98, 209–10, 258–69—and the Cancellation will result in nearly half of all borrowers (20 of 43 million) having "their debt completely" eliminated, R. Doc. 5-3, at 31. Because many borrowers have more than one account, *see* R. Doc. 5-1, at 403–07, MOHELA stands to lose at least half of the

9

Direct Loan accounts it services, which equates to millions of dollars of revenue per year. Stripping MOHELA of that money will leave fewer resources to fund loans and provide financial assistance through the State's Department of Higher Education. That is a cognizable harm to the State. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("[A] loss of even a small amount of money is ordinarily an 'injury.'").

The district court dismissed MOHELA's interests by claiming that the "financial harms" to MOHELA "are not attributable to" Missouri. R. Doc. 44, at 13. But MOHELA is a *state* entity within Missouri's Department of Higher Education and Workforce Development run by *state* officials performing essential *state* functions. *See* Mo. Rev. Stat. §§173.360, 173.445. That entity's undisputed financial harms directly affect Missouri by hindering MOHELA from advancing its essential public purposes. Missouri has standing "to protect" these "rights and interests of the state" in court. Mo. Rev. Stat. §27.060.

The district court's analysis focused on whether Missouri's Eleventh Amendment sovereign immunity extends to MOHELA as an "arm of the State." *See* Doc. 44, at 9 (citing that framework). But sovereign

10

immunity and standing are "distinct jurisdictional requirements." *Duit Constr. Co. v. Bennett*, 796 F.3d 938, 940 (8th Cir. 2015); *accord Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) (the two are not "coextensive").

The district court also emphasized that Missouri's general revenues are not available to pay MOHELA's debts. *See* R. Doc. 44, at 10–11. Yet that does not change the fact that MOHELA is (1) a state entity (2) that will be financially harmed by the Cancellation (3) and that uses its finances to perform the "essential public function[s]" of providing student loans and supporting the State's higher education system. Mo. Rev. Stat. §173.360. Those facts establish standing.

### 2. The direct tax losses create standing.

Nebraska, Iowa, Kansas, and South Carolina face a "direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). To determine an individual's taxable state income, those States use the individual's federal adjusted gross income as a baseline. *See* Neb. Rev. Stat. §77-2714.01(1); Iowa Code §422.7; Kan. Stat. Ann. §79-32,117(a); S.C. Code §12-6-40. Normally, federal adjusted gross income includes student loan discharge. *See* 26 U.S.C. §61(a)(11).

11

But under the American Rescue Plan Act of 2021, discharges occurring before January 1, 2026, are not included in federal adjusted gross income. *See* 26 U.S.C. §108(f)(5).

Under existing law, the States are set to tax a substantial amount of student loan debt discharge *after* 2025. Because the Cancellation will immediately reduce the pool of debt to discharge in the future, it will result in less for the States to tax. Contrary to what the district court said, *see* R. Doc. 44, at 18, that injury is "actual" and "imminent," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The tax laws are clear, and so their results here are certainly impending. Even if the total loss is unknown, that doesn't matter because any monetary loss is an Article III injury. *See Czyzewski*, 137 S. Ct. at 983. The Cancellation will deprive the States of tax revenue, and they have standing to prevent such losses.

The district court reasoned that State "legislatures are free to pro-pose and pass tax revenue plans as they see fit." R. Doc. 44, at 18. But the States cannot "avoid injury altogether" because forcing them to exer-cise their "power to create and enforce a legal code" is itself an injury, and "the possibility that a plaintiff could avoid [one] injury by incurring

Appellate Case: 22-3179     Page: 15     Date Filed: 10/21/2022 Entry ID: 5210216

[another] does not negate standing." *Texas v. United States*, 809 F.3d 134, 156–57 (5th Cir. 2015).

### 3. The consolidation harms create standing.

Missouri, Arkansas, and Nebraska have experienced various harms because the Cancellation predictably prompted the extensive consolidation—and thus elimination—of non-federally held FFEL loans. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (establishing a causal connection through the "predictable effect of Government action on the decisions of third parties").

Starting with Missouri, this consolidation harms the State because it erases assets—FFEL loans—that MOHELA uses to secure bonds; it ends ongoing interest payments from those loans; and it stops the fees earned from servicing those loans. *See* R. Doc. 5-1, at 66–67, 87. Eliminating those FFEL loans thus "reduc[es] the return on [MOHELA's] investments" and inflicts an "actual financial injury." *Franchise Tax Bd. of California v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).

Arkansas is similarly injured through ASLA. Before the Cancellation, ASLA held $100 million in FFEL loans. R. Doc. 5-4, at 2, ¶6. Since the program was announced, about $6 million of those loans have been

Appellate Case: 22-3179     Page: 16     Date Filed: 10/21/2022 Entry ID: 5210216

consolidated. *Id.* at 2, ¶7. Because ASLA's administrative fee is based on the amount of its FFEL loans, the Cancellation has reduced ASLA's revenue. *Id.* at 2, ¶8. That, in turn, lowers ASLA's funding to pursue its finance- and education-focused mission. *See* Ark. Code Ann. §15-5-1904(c) (listing those goals).

Nebraska is also harmed by consolidation. NIC invests tens of millions of dollars in SLABS. *See* R. Doc. 5-2, at 1–2, ¶¶4–7. But consolidating FFEL loans raises repayment rates on the loans held in FFEL SLABS, which returns the principal early and ends the interest income that SLABS are intended to generate. *See* R. Doc. 5-1, at 48 (noting that a FFEL-backed security might be harmed if "prepayments" of FFEL loans increase because they "are consolidated under the Direct Loan Program"); R. Doc. 5-2, at 2, ¶8 (expecting the Cancellation "will increase prepays for FFELP SLABS"). Harming Nebraska's investments in this way inflicts an "actual financial injury." *See Franchise Tax Bd.*, 493 U.S. at 336.

The district court concluded that the consolidation harms have stopped because borrowers with non-federally held FFEL loans can no longer become eligible through consolidation. R. Doc. 44, at 13–14. This

14

ignores that "voluntary cessation of a challenged practice" generally "does not moot a case." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017). This rule is particularly salient here since the Department is looking for "alternative pathways to provide relief to borrowers with federal student loans not held by [the Department], including FFEL Program loans." R. Doc. 31-1, at 9–10. Moreover, an immediate injunction preventing the Department from discharging debt preserves the chance for a permanent injunction remedying some of the consolidation harms, such as an order telling the Department to direct borrowers who recently consolidated FFEL loans to pay part of the interest to the entity that held the FFEL loan.

### 4. The States' sovereign and quasi-sovereign interests create standing.

The States also have standing to vindicate the sovereign and quasi-sovereign interests that the Cancellation impairs. States have "a quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). And States may assert their sovereign and quasi-sovereign interests against "the United

15

Appellate Case: 22-3179    Page: 18    Date Filed: 10/21/2022 Entry ID: 5210216

States and its agents." *Kentucky v. Biden*, 23 F.4th 585, 596–99 (6th Cir. 2022).

Here, the States raise multiple sovereign and quasi-sovereign interests. First is Missouri's interest in MOHELA furthering the "essential public function[s]" of providing student aid and funding the State's public universities. Mo. Rev. Stat. §173.360. When the Cancellation reduces MOHELA revenue and diminishes its access to bond markets, it impairs Missourians' access to higher education and harms the State's "interest in the … well-being … of its residents." *Alfred L. Snapp*, 458 U.S. at 607. Second is the similar harm to Arkansas through ALSA. The reduction in its revenue will limit its ability to provide educational opportunities to Arkansans through student loans. *See* Ark. Code Ann. §15-5-1904(c).

## B. The States are likely to prevail on their APA claim that the Department is exceeding its authority.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "in excess of statutory … authority." 5 U.S.C. §706(2)(A)–(C). The Department claims authority under the HEROES Act. That Act provides, in relevant part, that the Secretary may "waive or modify any statutory or regulatory provision applicable to student financial assistance programs" when "necessary to ensure that recipients

16

of student financial assistance … who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. §1098bb(a)(1)–(a)(2)(A). This text does not authorize the Cancellation.

### 1. The major-questions doctrine applies.

The Supreme Court just reaffirmed that a federal agency may regulate on issues of immense "economic and political significance" only with explicit congressional authorization. *West Virginia*, 142 S. Ct. at 2608. The Court "presume[s] that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 2609 (cleaned up). These principles apply here.

*First*, as the Department conceded, *see* R. Doc. 27, at 41, it is claiming the authority to resolve a matter of great "economic and political significance." *West Virginia*, 142 S. Ct. at 2608. With estimated costs between $430 billion and $519 billion, *see* CBO Sept. 26, 2022 Letter at 3; R. Doc. 5-3, at 23, the economic significance is plain. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ($50 billion effect). So is the political significance. Congress has "conspicuously and repeatedly declined to enact" the Cancellation,

17

*West Virginia*, 142 S. Ct. at 2610, rejecting many sweeping student loan discharge efforts, including some bills specifically tied to COVID-19 relief. *E.g.*, H.R. 2034, 117th Cong. (2021); H.R. 6800, 116th Cong. §150117(h) (2020); S. 2235, 116th Cong. (2019).

*Second*, the Department claims an "unheralded power." *West Virginia*, 142 S. Ct. at 2610. Until now, the Department has "generally invoked the HEROES Act relatively narrowly to grant relief to limited subsets of borrowers, such as deployed military service members or victims of certain natural disasters." *The Biden Administration Extends the Pause on Federal Student Loan Payments*, Congressional Research Service, at 2–3 (Jan. 27, 2021), https://tinyurl.com/yxwm4eyj. It has not "relied on the HEROES Act … for the blanket or mass cancellation … of student loan principal balances." Jan. 2021 Memo at 6.

*Third*, "[t]here is little reason to think Congress" intended the HEROES Act to authorize the Cancellation. *West Virginia*, 142 S. Ct. at 2612. The congressional findings leave no doubt that Congress's focus was affording relief to those serving in the "military" for "our nation's defense." 20 U.S.C. §1098aa(b)(1)–(6). They are not focused on nation-wide debt cancellation.

18

*Fourth*, "the sheer scope of the [Department's] claimed authority" confirms that the major-questions doctrine applies. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. The Department claims that the class of "affected individuals" for whom it may grant relief includes every "borrower who 'resides or is employed in'" the United States or "abroad." R. Doc. 27, at 33–34. And it suggests that it could discharge all borrowers' "entire loan amount" if necessary to "mitigate the risk that delinquency and default rates will rise." R. Doc. 27-1, at 14. Courts greet such "assertions of extravagant statutory power" with skepticism. *West Virginia*, 142 S. Ct. at 2609 (cleaned up).

### 2. No clear congressional authorization exists.

When the major-questions doctrine applies, "the Government must … point to clear congressional authorization" permitting its action. *West Virginia*, 142 S. Ct. at 2614 (quotation marks omitted). None exists here.

*First*, the HEROES Act requires that the Secretary's relief is "necessary to ensure" the assisted borrowers will not fall into "a worse position financially in relation to" their student loans. 20 U.S.C. §1098bb(a)(2)(A). But the Cancellation does not simply prevent borrowers from slipping into a *worse* position; it seeks to place them in a *better* position by

Appellate Case: 22-3179     Page: 22     Date Filed: 10/21/2022 Entry ID: 5210216

reducing the principal they owe. Additionally, the Secretary has not shown that cancelling up to $20,000 in debt is necessary to keep most eligible borrowers out of trouble.

*Second*, the Act permits relief "in connection with a … military operation or national emergency." 20 U.S.C. §1098bb(a)(1). Military operations and national emergency are by nature *temporary*, and the same must be true of the relief afforded. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("a word is known by the company it keeps"). Here, however, the Cancellation, unlike the payment pause, purports to *permanently* erase up to $20,000 per borrower.

*Third*, the Act demands that the "affected individuals" benefitted by the relief must be at risk of facing "a worse position financially in relation to" their loans. 20 U.S.C. §1098bb(a)(2)(A). But many eligible borrowers—for example, individuals whose annual income has increased substantially since 2020 (including growth above the Cancellation's income cutoff)—are not remotely at risk of falling into a worse position. *See* 87 Fed. Reg. at 61514 (requiring borrowers to meet the income cutoff in 2020 *or* 2021).

*Fourth*, the Act limits relief to "affected individuals." 20 U.S.C. §1098bb(a)(2)(A). Yet the Cancellation is not confined to borrowers who have suffered "direct economic hardship as a direct result" of the pandemic. 20 U.S.C. §1098ee(2)(D). Nor is it restricted to people who live or work in "a disaster area" in the United States. 20 U.S.C. §1098ee(2)(C).

*Fifth*, the Act applies only when borrowers are facing "a worse position financially in relation to [their] financial assistance *because of*" the invoked national emergency. 20 U.S.C. §1098bb(a)(2)(A) (emphasis added). The Department worries that borrowers' position might deteriorate because forbearance is ending and economic conditions are difficult. R. Doc. 27-1, at 10–13. But these concerns stretch beyond COVID-19. Forbearance is a prior agency action benefitting borrowers, and current economic conditions, as the Department admits, are caused by myriad factors unrelated to COVID-19. *See id.* at 12 (citing "other factors (such as Russia's invasion of Ukraine)"). The Department's economic concerns are not "because of" COVID-19.

Appellate Case: 22-3179   Page: 24   Date Filed: 10/21/2022 Entry ID: 5210216

## C. The States are likely to prevail on their APA arbitrary-and-capricious claim.

Courts applying the APA must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious." 5 U.S.C. §706(2)(A). The Cancellation is arbitrary and capricious for at least five reasons.

*First*, the Department's Rationale Memo failed to consider *any* reasonable alternatives to the mass elimination of debt. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (cleaned up). The Department is switching from a forbearance policy to the Cancellation, so it must consider alternatives, such as (1) continuing forbearance or (2) lengthening repayment periods to decrease monthly payments. Because those alternatives (particularly continued forbearance) are plainly within the ambit of the Department's existing policy, the failure to consider them is enough to "render[] [the] decision arbitrary." *Regents*, 140 S. Ct. at 1913.

*Second*, the Department's reliance on COVID-19 as a justification for the Cancellation is "pretextual," *Dep't of Commerce*, 139 S. Ct. at 2573, and an impermissible "*post hoc* rationalization," *Regents*, 140 S. Ct. at

22

1908. The agency did not first identify the Cancellation as "necessary" to protect borrowers. 20 U.S.C. §1098bb(a)(2)(A). Rather, student loan cancellation has long been the President's goal, and his Administration is using the pandemic as cover to "follow[] through" on his campaign "promise." *See* R. Doc. 5-3, at 29. Confirming this, the Secretary signed the directive to launch the Cancellation at 9:25 am on the day he received the Rationale Memo, *see* R. Doc. 27-1, at 25, showing that the supposed reliance on COVID-19 is "contrived," *Dep't of Commerce*, 139 S. Ct. at 2575.

*Third*, the Department has not even tried to justify the Cancellation's exceedingly broad and arbitrary scope. The agency documents do not offer any explanation—much less the required reasonable explanation—for the $250,000 household income cutoff. Nor has the agency bothered to address why it is sufficient if borrowers meet the income requirement in either 2020 or 2021 (rather than in both years). Such failures to address central eligibility requirements—which drive the Cancellation's broad scope—cannot survive review.

*Fourth*, because the Department is changing its forbearance policy and thus "not writing on a blank slate, it *was* required to assess whether

Appellate Case: 22-3179     Page: 26     Date Filed: 10/21/2022 Entry ID: 5210216

there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915. But nothing in the agency materials suggests that the Department did this. The failure to "consider[]" any "reliance interests" is "arbitrary and capricious." *Id.*

*Fifth*, the Department's September 29 change on FFEL consolidation is also arbitrary, distinguishing borrowers with non-federally held FFEL loans who applied for consolidation before September 29 from those who did not. R. Doc. 31-1, at 9. The agency never attempts to justify this arbitrary distinction. Nor is there any reasonable explanation for it.

### D. The States are likely to prevail on their ultra-vires separation-of-powers claim.

The States are also likely to prevail on their ultra-vires separation-of-powers claim. An "implied private right of action" exists "directly under the Constitution to challenge [unconstitutional] governmental action" by the federal government. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). That includes suits against federal officials for "actions [that] are ultra vires [their] authority" or in violation of the Constitution. *Larson v. Domestic & Foreign Com. Corp.*,

24

337 U.S. 682, 689–90 (1949).  Thus, "judicial review is available" for the States' ultra-vires separation-of-powers claim "even if a statutory cause of action" under the APA "is lacking."  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006).  The States are likely to succeed on this claim because, as explained above, the Cancellation exceeds the Administration's statutory and constitutional authority.

## II.   The States face irreparable harm without an injunction.

Without immediate injunctive relief, the States will suffer irreparable harm.  All four categories of injuries identified in the standing analysis are irreparable.

*First*, Missouri faces irreparable injury through the financial harms to MOHELA.  The Cancellation will cause Direct Loan accounts to disappear, which will cost MOHELA revenue.  That revenue is not recoverable and thus "qualif[ies] as irreparable harm."  *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *see also Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (finding irreparable harm when defendants had "sovereign immunity" against "money damages").

*Second*, the States' loss of tax revenue is irreparable.  Once the Department discharges hundreds of billions of dollars in loan debt, that

Appellate Case: 22-3179     Page: 28     Date Filed: 10/21/2022 Entry ID: 5210216

potential tax revenue will be lost for good.  Tellingly, the Supreme Court "enjoin[ed] enforcement of the Act" in *Wyoming*, 502 U.S. at 461, indicating that it deemed irreparable the lost tax revenue.

*Third*, the harms to the States from FFEL loan consolidations also cannot be undone.  As discussed, the Department—which is searching for "pathways to provide relief" to borrowers with non-federally held FFEL loans, R. Doc. 31-1, at 9–10—might reopen the consolidation pathway to eligibility.  Thus, the incentive to consolidate, and the irreparable harm of lost FFEL loans, remains.

*Fourth*, undermining MOHELA's and ASLA's financial health harms Missouri's and Arkansas's quasi-sovereign interests in promoting higher education.  Injuries to these interests are widely dispersed, "difficult … to quantify," cannot be remedied with damages, and thus are irreparable.  *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003).

## III. An injunction would not injure the Department, and the public interest favors an injunction.

An order preventing the Department from enforcing its unlawful Mass Debt Cancellation will inflict no cognizable injury on the agency because officials "do[] not have an interest in the enforcement of [illegal

26

government action]." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Nor will an injunction harm borrowers because their loan payments have been deferred and interest is not accruing, and the Department can extend that forbearance.

The public interest similarly supports the States. "[T]he public's true interest lies in the correct application of the law." *Kentucky*, 23 F.4th at 612. Accordingly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2490. Since the Cancellation is unlawful, the public interest supports enjoining it.

## CONCLUSION

The States request an injunction pending appeal.

Appellate Case: 22-3179    Page: 30    Date Filed: 10/21/2022 Entry ID: 5210216

Dated: October 21, 2022

Respectfully submitted,

*/s/ James A. Campbell*
James A. Campbell

ERIC S. SCHMITT
 *Attorney General of Missouri*
D. JOHN SAUER
 *Solicitor General of Missouri*
MICHAEL E. TALENT
 *Deputy Solicitor General of Missouri*
MISSOURI ATTORNEY GENERAL'S
 OFFICE
Post Office Box 899
Jefferson City, MO 65102
(314) 340-4869
michael.talent@ago.mo.gov

LESLIE RUTLEDGE
 *Attorney General of Arkansas*
NICHOLAS J. BRONNI
 *Solicitor General of Arkansas*
DYLAN L. JACOBS
 *Deputy Solicitor General of Arkansas*
OFFICE OF THE ARKANSAS ATTORNEY
 GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

DOUGLAS J. PETERSON
 *Attorney General of Nebraska*
JAMES A. CAMPBELL
 *Solicitor General of Nebraska*
CHRISTIAN EDMONDS
 *Assistant Solicitor General of Nebraska*
OFFICE OF THE NEBRASKA
 ATTORNEY GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

JEFFREY S. THOMPSON
 *Solicitor General of Iowa*
SAMUEL P. LANGHOLZ
 *Assistant Solicitor General of Iowa*
OFFICE OF THE IOWA ATTORNEY
 GENERAL
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov

Appellate Case: 22-3179   Page: 31   Date Filed: 10/21/2022 Entry ID: 5210216

DEREK SCHMIDT
  *Attorney General of Kansas*
SHANNON GRAMMEL
  *Deputy Solicitor General of*
  *Kansas*
OFFICE OF THE KANSAS ATTORNEY
  GENERAL
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
(785) 296-2215
shannon.grammel@ag.ks.gov

ALAN WILSON
  *Attorney General of South Carolina*
J. EMORY SMITH, JR.
  *Deputy Solicitor General of*
  *South Carolina*
OFFICE OF THE ATTORNEY GENERAL
  OF SOUTH CAROLINA
P.O. Box 11549
Columbia, SC 29211
803-734-3680
ESmith@scag.gov

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 5,139 words as determined by the word-counting feature of Microsoft Word 2016.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point proportionally spaced Century Schoolbook font.

And this motion complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Windows Defender and no virus was detected.

*/s/ James A. Campbell*
James A. Campbell

Appellate Case: 22-3179   Page: 33   Date Filed: 10/21/2022 Entry ID: 5210216

# CERTIFICATE OF SERVICE

I certify that on October 21, 2022, I electronically filed the foregoing motion with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties represented by counsel who are registered CM/ECF users. I also certify that a copy of the foregoing motion was served by electronic mail on counsel for Defendants-Appellees who have consented in writing to electronic mail service at the following addresses:

Thomas Pulham
Thomas.Pulham@usdoj.gov

Courtney L. Dixon
Courtney.L.Dixon@usdoj.gov

Simon C. Brewer
Simon.C.Brewer@usdoj.gov

Michael S. Raab
Michael.Raab@usdoj.gov

Sarah W. Carroll
Sarah.W.Carroll@usdoj.gov

*/s/ James A. Campbell*
James A. Campbell

Appellate Case: 22-3179    Page: 34    Date Filed: 10/21/2022 Entry ID: 5210216