CASE NO. 22-3179

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

STATE OF NEBRASKA, et al.,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, JR., in his official capacity as the President of the United States of America, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Missouri
The Honorable District Court Judge Henry E. Autrey
Case No. 4:22-cv-1040-HEA

**REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL**

| | |
|---|---|
| ERIC S. SCHMITT<br>  *Attorney General of Missouri*<br>D. JOHN SAUER<br>  *Solicitor General of Missouri*<br>MICHAEL E. TALENT<br>  *Deputy Solicitor General of Missouri*<br>MISSOURI ATTORNEY GENERAL'S<br>  OFFICE<br>Post Office Box 899<br>Jefferson City, MO 65102<br>(314) 340-4869<br>michael.talent@ago.mo.gov | DOUGLAS J. PETERSON<br>  *Attorney General of Nebraska*<br>JAMES A. CAMPBELL<br>  *Solicitor General of Nebraska*<br>CHRISTIAN EDMONDS<br>  *Assistant Solicitor General of Nebraska*<br>OFFICE OF THE NEBRASKA<br>  ATTORNEY GENERAL<br>2115 State Capitol<br>Lincoln, NE 68509<br>(402) 471-2682<br>jim.campbell@nebraska.gov |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 1

I. The States have a strong likelihood of success on appeal. .............. 1

    A. The States have standing. ..................................................... 1

        1. Missouri has standing. ................................................ 1

        2. The direct tax losses create standing. ......................... 4

        3. The consolidation harms create standing. .................. 5

        4. The States' sovereign and quasi-sovereign interests create standing. ..................................................... 6

    B. The States are likely to prevail on their APA exceeding-authority claim. ................................................................... 7

        1. The major-questions doctrine applies .......................... 7

        2. No clear congressional authorization exists. ................ 8

    C. The States are likely to prevail on their APA arbitrary-and-capricious claim. ....................................................... 10

II. The remaining equitable factors favor the States. ........................ 11

III. The Court should enjoin the entire Cancellation program. .......... 12

CONCLUSION ...................................................................................... 13

CERTIFICATE OF COMPLIANCE ......................................................... 16

CERTIFICATE OF SERVICE ................................................................. 17

# INTRODUCTION

The Department barely defends the district court's standing analysis. It apparently realizes that the States have standing, so the Court will reach the merits. Once there, the case isn't close. The Department's contrived reasons for rejecting the major-questions doctrine do not override the clear evidence confirming that it applies. And the agency's baseless reading of the HEROES Act places practically no limits on the Secretary's power to discharge debt during or after national emergencies. The Court should enjoin this clearly unauthorized agency action.

# ARGUMENT

## I. The States have a strong likelihood of success on appeal.

### A. The States have standing.

#### 1. Missouri has standing.

The Department wisely abandons the district court's sovereign-immunity-based analysis because those principles do not govern standing and this Court's caselaw indicates that Missouri entities like MOHELA are likely arms of the State. *See Pub. Sch. Ret. Sys. of Mo. v. State St. Bank & Tr. Co.*, 640 F.3d 821, 826–30 (8th Cir. 2011) (concluding that a

Appellate Case: 22-3179    Page: 3    Date Filed: 10/25/2022 Entry ID: 5211454

similarly constituted Missouri entity is an arm of the State despite its authority "to sue and be sued").

The Department instead insists (at 8) that "financial harms to MOHELA" do not affect Missouri. But stripping MOHELA of revenue harms Missouri's interests in many ways. It limits MOHELA's ability to contribute to the Missouri Department of Higher Education and Workforce Development's financial aid programs. *See* MOHELA FY 2022 Financial Statement at 9–10, 19, https://tinyurl.com/4chp295x. It also undermines MOHELA's ability to pay the $105.1 million it owes to the State Treasury's Lewis and Clark Discovery Fund, *id.* at 20, which supports "capital projects" at Missouri's "public colleges and universities," Mo. Rev. Stat. §173.392.2. And it hinders MOHELA in carrying out its "essential public function" of ensuring that Missouri "students have access to student loans." §173.360.

Because MOHELA is a state entity, helps fund state programs, and performs essential public functions for the State, Missouri has numerous interests in MOHELA's financial health. State law authorizes the Missouri Attorney General to sue "in the name and on the behalf of the state … to protect" these "interests." Mo. Rev. Stat. §27.060; *see Missouri ex*

2

*rel. Hawley v. Pilot Travel Ctr.*, 558 S.W.3d 22, 30 (Mo. banc 2018) (permitting suit under §27.060 to vindicate "the legislature's statutory purposes"). Other cases considering similar state laws and theories of injury have allowed States to sue for harms to their constituent entities. *E.g.*, *Arkansas v. Texas*, 346 U.S. 368, 370–71 (1953); *Alaska v. Chevron Chem. Co.*, 669 F.2d 1299, 1301–02 (9th Cir. 1982). Missouri can do the same here.

The Contract Disputes Act (CDA) does not require Missouri to file this case in the Court of Federal Claims. *Contra* Opp'n 9. Missouri is not alleging a breach of contract but challenging a new agency rule under the APA. "[T]he proper method" to "challenge the validity of a regulation"—even one affecting federal contracting—"is to bring an action in federal district court under the [APA]." *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1135 (Fed. Cir. 1998). The Court of Federal Claims "does not have jurisdiction to review the validity of regulations pursuant to the [APA]." *Boeing Co. v. United States*, --- Fed. Cl. ----, 2022 WL 4364180, at *4 (Fed. Cl. Sept. 21, 2022) (collecting cases and distinguishing the Department's cited caselaw).

3

## 2. The direct tax losses create standing.

The "causal chain" that the Department identifies (at 11) for the States' tax harms is not "attenuated" but clear and inevitable. First, the definition of federal and state taxable income is established by law. *See* Mot. 11–12. Second, federal law provides that student loans will be discharged in upcoming years. *E.g.*, 34 C.F.R. § 685.221(f) (directing forgiveness for certain loans). Third, if the Cancellation occurs, there will be fewer future loan discharges for the States to tax. That chain is far more direct than the standing theories the Supreme Court and others have accepted in census lawsuits. *E.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565–66 (2019); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353–54 (8th Cir. 1985) (discussing *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (per curiam)).

Nor does the Department's argument (at 12) that the States' tax injuries are "self-inflicted" defeat standing. "Courts regularly entertain actions brought by states … that face economic injury, even though [they] theoretically could avoid the injury by enacting new legislation." *California v. Azar*, 911 F.3d 558, 574 (9th Cir. 2018). *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976), on which the Department relies, is

4

inapposite. First, Pennsylvania did not sue "in response to a significant change in the defendants' policies," but the States here did, proving their "injury is not self-inflicted." *Texas v. United States*, 809 F.3d 134, 158 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016). Second, Pennsylvania "could have achieved [its] policy goal in myriad ways," while the States here would have been forced to "surrender[]" their "permissible policy goal" of linking state and federal taxable income. *See id.* at 158–59 & n.65. Because the Cancellation directly reduces the amount of debt discharge available to tax, this case mirrors *Wyoming v. Oklahoma*, 502 U.S. 437, 447–48 (1992)—not *Pennsylvania*—and the States have standing.

### 3. The consolidation harms create standing.

The Department dismisses the voluntary-cessation exception to mootness (at 10) because the agency allegedly started to change its rule on FFEL consolidation the night before this case began. But what matters is when reviewable agency action occurs—not when internal agency discussions happen. *See Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022) (rejecting the idea that agency action occurs "apart from" implementation). Reviewable action occurred here when the website changed

5

on September 29 or the HEROES Act waiver was published on October 12. *See* R. Doc. 37, at 39–40 (stating the Department's view that "the formal act … authoriz[ing] the forgiveness" was "the publication"). Because those events happened after this suit began, mootness (not standing) rules apply. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) (standing focuses on "when the suit was filed"). Moreover, the Department doesn't deny that "an immediate injunction preventing the [agency] from discharging debt preserves the chance for a permanent injunction remedying some of the consolidation harms." Mot. 15. Thus, a current, redressable controversy remains over the consolidation harms.

> 4. **The States' sovereign and quasi-sovereign interests create standing.**

The Department argues at (10–11) that the States lack *parens patriae* standing against the federal government. That bar applies only to States' suits brought "purely on behalf of their own citizens' interests." *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022). Here, the States rely on sovereign and quasi-sovereign interests that do not rest on purely private interests, *see* Mot. 16, and thus they have standing. *See Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007); *Kentucky*, 23 F.4th at 598–99 (gathering cases).

6

## B. The States are likely to prevail on their APA exceeding-authority claim.

### 1. The major-questions doctrine applies.

The Department's silence on key major-questions factors confirms the doctrine's application. The agency conceded below that this is "a case of economic and political significance," R. Doc. 27, at 41, and it doesn't dispute that Congress has "conspicuously and repeatedly declined to enact" legislation achieving what the Cancellation would, *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022). These factors suffice because courts "presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions." *Id.* at 2613.

The Department seeks to dismiss the major-questions doctrine (at 18) because this case involves federal services rather than "'regulatory authority' over private parties." But courts have applied the doctrine to the COVID-19 vaccine mandate for federal contractors—entities that provide federal services. *E.g.*, *Kentucky*, 23 F.4th at 606–08; *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022).

The Department also contends (at 19) that the Cancellation is not an "unheralded power'" under the HEROES Act. Yet nowhere does the Department claim that the Act has ever been used to discharge debt.

Indeed, the Department argues (at 18) that the alleged harm it seeks to address through the Cancellation occurs after every emergency-induced payment pause, but the agency has never implemented anything like the Cancellation. Rather than cite that Act, the Department says that it has used a *different* provision in the Higher Education Act (HEA)—20 U.S.C. §1082(a)(6)—to cancel debt. But the lone example of debt discharged under that statute involves borrowers who attended a specific association of schools—a targeted action that hardly resembles the global Cancellation.

Nor does the section of the American Rescue Plan Act (ARPA) "making student-loan discharges tax-free" until 2025 mean that Congress endorsed this use of the HEROES Act. *Contra* Opp'n 20. That ARPA provision exempts a broad category of debt discharges (not just the federally held debt at issue here) and makes no reference to the HEROES Act. *See* Pub. L. 117-2, §9675, 135 Stat. 4, 185–86 (Mar. 11, 2021).

### 2. No clear congressional authorization exists.

The Department does not deny that the Cancellation "seeks to place [borrowers] in a *better* position," rather than simply preventing them

8

"from slipping into a worse position." Mot. 19. This alone proves that the Department has exceeded its statutory authority.

The Department advocates for a breathtakingly broad reading of the HEROES Act. It claims (at 14) that the phrase "deems necessary" "exudes deference" to the Secretary, citing a case—*Webster v. Doe*, 486 U.S. 592, 600 (1988)—that precluded judicial review altogether. But *Webster* construed the statutory phrase "deem … necessary *or advisable*," *id.* (emphasis added), which is significantly more deferential than "deems necessary." Also, while the first sentence of the HEROES Act includes the phrase "deems necessary," 20 U.S.C. §1098bb(a)(1), the most relevant part says that the action must "be necessary to ensure" the statutory goals are met, §1098bb(a)(2). That language requires meaningful judicial review of the Department's actions—not the judicial pass the agency seeks. *See Kentucky*, 23 F.4th at 607 n.14 (noting the non-delegation concerns raised by a similarly broad statutory reading).

The Department also argues (at 18) that the HEROES Act authorizes any action for which a national emergency is a but-for cause. Because the but-for "consequences of an act go forward to eternity," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266 n.10 (1992), that

interpretation produces absurd results, permitting COVID-19 to justify the mass elimination of debt for years to come. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (counseling against absurd interpretations). Read correctly, the statute demands proximate or direct causation, meaning COVID-19 must be the "cause that directly produces" the need for relief. *Proximate Cause*, Black's Law Dictionary (11th ed. 2019); *see, e.g.*, *Holmes*, 503 U.S. at 265–68 (interpreting the phrase "by reason of" in the federal RICO statute to require proximate causation). The Department has not shown that here.

Lastly, the Department says (at 17) that because the Secretary need not act "on a case-by-case basis," he is allowed some "imprecision." But this is not a case of minor imprecision. The Secretary has wholly failed to justify core eligibility requirements, *see* Mot. 23, and drafted a rule that does not come close to complying with the HEROES Act's text.

### C. The States are likely to prevail on their APA arbitrary-and-capricious claim.

The Department argues at (21) that it considered the option of continuing forbearance because it extended forbearance until the end of 2022. But the Department did not consider whether to extend forbearance beyond 2022. That renders its action arbitrary.

10

The Department also contends (at 23–24 n.2) that the States lack an interest in challenging the arbitrary distinction between FFEL borrowers who consolidated before September 29 and those who did not. Yet the States are directly harmed by FFEL consolidation, so they may challenge the inclusion of borrowers who consolidated. The Department is desperate to avoid this issue because the agency has no reasonable explanation for its shifting treatment of FFEL consolidation.

## II. The remaining equitable factors favor the States.

*Public Interest and No Harm to the Department.* The Department (at 24–25) does not deny that if the Cancellation is unlawful, the injunction is in the public interest, and the agency will not be harmed by it. *See* Mot. 26–27. The Department thus concedes that these factors justify relief if the States are likely to succeed on the merits.

*Irreparable Harm.* The Department's irreparable-harm arguments (at 25) simply repackage its standing arguments and are meritless for the same reasons. The Department also intimates (at 26) that the payment pause somehow undermines the States' irreparable harm. Yet forbearance did not erase loan accounts like the Cancellation does. The harms at issue here are thus different than those caused by forbearance.

11

## III. The Court should enjoin the entire Cancellation program.

"[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Indeed, the APA itself—which permits courts to "set aside" unlawful agency action, 5 U.S.C. § 706(2)—"contemplates nationwide relief from invalid agency action." *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2412 n.28 (2020) (Ginsburg, J., dissenting). "Courts across the country interpret the APA [this] way." *Texas v. United States*, No. 6:21-CV-00016, 2022 WL 2109204, at *46 (S.D. Tex. June 10, 2022), *cert. granted*, No. 22A17 (U.S. July 21, 2022) (collecting cases). The injunction requested here would temporarily set aside the Secretary's HEROES Act waiver, thereby prohibiting implementation of the Cancellation. Such programmatic relief is consistent with the Supreme Court's order staying the entire OSHA COVID-19 vaccine mandate pending full review. *See NFIB v. OSHA*, 142 S. Ct. 661, 666–67 (2022) (per curiam).

Additionally, an injunction limited to certain States or borrowers would fail "to provide complete relief to the plaintiffs." *Madsen v.*

*Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). MOHELA services accounts for borrowers nationwide, *see* Mot. 2, so a state-specific injunction will not prevent the harms to Missouri through MOHELA. Nor would an injunction confined to loans serviced by MOHELA. The Department could easily skirt that relief by transferring loans eligible for the Cancellation to other servicers. *See Who's My Student Loan Servicer*, U.S. Dep't of Educ., https://tinyurl.com/2p9xkya8 (listing nine servicers).

There is also "a substantial likelihood that a geographically-limited injunction would be ineffective because" borrowers and accounts "move among states." *Texas*, 809 F.3d at 188; *see also Pennsylvania v. President U.S.*, 930 F.3d 543, 576 (3d Cir. 2019), *rev'd on other grounds*, *Little Sisters*, 140 S. Ct. 2367 (2020). Regarding the States' tax harms, interstate migration means that a borrower living in California with a loan serviced in Wisconsin may reside in Iowa in 2026, so cancelling that debt inflicts injury on Iowa. And as for the consolidation harms, FFEL consolidations injure the States even if the borrowers live beyond their borders.

## CONCLUSION

The Court should enter an injunction pending appeal that stops further implementation of the Cancellation. If the Court denies that

13

request or enters a narrow injunction, the States ask that the temporary administrative stay remain in place for one week after this Court's forthcoming order so that they can seek relief from the Supreme Court.

Dated: October 25, 2022

Respectfully submitted,

*/s/ James A. Campbell*
James A. Campbell

ERIC S. SCHMITT
  *Attorney General of Missouri*
D. JOHN SAUER
  *Solicitor General of Missouri*
MICHAEL E. TALENT
  *Deputy Solicitor General of Missouri*
MISSOURI ATTORNEY GENERAL'S
  OFFICE
Post Office Box 899
Jefferson City, MO 65102
(314) 340-4869
michael.talent@ago.mo.gov

DOUGLAS J. PETERSON
  *Attorney General of Nebraska*
JAMES A. CAMPBELL
  *Solicitor General of Nebraska*
CHRISTIAN EDMONDS
  *Assistant Solicitor General of Nebraska*
OFFICE OF THE NEBRASKA
  ATTORNEY GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

LESLIE RUTLEDGE
  *Attorney General of Arkansas*
NICHOLAS J. BRONNI
  *Solicitor General of Arkansas*
DYLAN L. JACOBS
  *Deputy Solicitor General of Arkansas*
OFFICE OF THE ARKANSAS ATTORNEY
  GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

JEFFREY S. THOMPSON
  *Solicitor General of Iowa*
SAMUEL P. LANGHOLZ
  *Assistant Solicitor General of Iowa*
OFFICE OF THE IOWA ATTORNEY
  GENERAL
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov

| | |
|---|---|
| DEREK SCHMIDT<br>  *Attorney General of Kansas*<br>SHANNON GRAMMEL<br>  *Deputy Solicitor General of Kansas*<br>OFFICE OF THE KANSAS ATTORNEY GENERAL<br>120 SW 10th Avenue, 2nd Floor<br>Topeka, KS 66612<br>(785) 296-2215<br>shannon.grammel@ag.ks.gov | ALAN WILSON<br>  *Attorney General of South Carolina*<br>J. EMORY SMITH, JR.<br>  *Deputy Solicitor General of South Carolina*<br>OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA<br>P.O. Box 11549<br>Columbia, SC 29211<br>803-734-3680<br>ESmith@scag.gov |

# CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(C) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 2,579 words as determined by the word-counting feature of Microsoft Word 2016.

This reply also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point proportionally spaced Century Schoolbook font.

And this reply complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Windows Defender and no virus was detected.

*/s/ James A. Campbell*
James A. Campbell

# CERTIFICATE OF SERVICE

I certify that on October 25, 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties represented by counsel who are registered CM/ECF users.

*/s/ James A. Campbell*
James A. Campbell